CHAPMAN LUMBER, INC. *v.* CLIFFORD L. TAGER
(SC 18021)
(SC 18023)
(SC 18026)
(SC 18022)

Rogers, C. J., and Norcott, Katz, Zarella and Schaller, Js.

Argued January 9—officially released July 22, 2008

*Jeffrey J. Tinley,* with whom, on the brief, was *Matthew J. Corcoran,* for the appellant in Docket Nos. SC 18021, 18023 and 18026, appellee in Docket No. SC 18022 (defendant).

*Charles F. Brower,* with whom was *Marcus G. Organschi,* for the appellee in Docket Nos. SC 18021, 18023 and 18026, appellant in Docket No. SC 18022 (plaintiff).

*Opinion*

SCHALLER, J. These appeals arise out of litigation brought against an attorney for the allegedly improper actions he undertook in connection with his representation of a financially troubled client. Both the defendant, Attorney Clifford L. Tager, and the plaintiff, Chapman Lumber, Inc., have appealed from the judgment rendered in accordance with a jury verdict, as it subsequently was modified by the trial court, and the defendant has filed two additional appeals challenging certain postjudgment rulings of the court. The defendant claims that the trial court: (1) lacked subject matter jurisdiction over this action because the plaintiff's claims were not ripe for adjudication;[1] (2) improperly

---

[1] The defendant, in a motion to dismiss filed with the Appellate Court, also contested whether appellate jurisdiction exists over the plaintiff's appeal. Specifically, he argued that the appeal was not taken from a final judgment or, alternatively, was not timely filed. Prior to transfer of the plaintiff's appeal to this court, the Appellate Court denied the defendant's motion to dismiss without prejudice to the defendant raising those issues in conjunction with argument on the merits of the appeal. The defendant continues to press this jurisdictional claim, and we will address it herein.

declined to open the judgment and set aside the jury's verdict, in whole or in part, because (a) the verdict violates public policy by imposing on an attorney a duty to a nonclient, (b) the verdict is contrary to applicable law governing the causes of action at issue and (c) the defendant's conduct, even if improper, did not cause the plaintiff's damages; (3) improperly awarded prejudgment interest pursuant to General Statutes § 37-3a;[2] and (4) improperly refused to conduct an evidentiary hearing in connection with the defendant's motions to open the judgment. The plaintiff claims that the trial court improperly: (1) reduced the jury's award of compensatory damages by an amount the plaintiff ultimately recovered from the bankruptcy estate of the defendant's client; and (2) effected that reduction without affording the plaintiff proper notice and the opportunity to argue that modification of the damages award was unwarranted. We disagree with all of the defendant's claims. We agree with the plaintiff that the court improperly reduced the jury's award of compensatory damages and, therefore, need not reach its second claim. Accordingly, we reverse the judgment of the trial court as subsequently modified.

The jury reasonably could have found the following facts. The defendant is a licensed attorney engaged as a solo practitioner of law. Prior to and during the year 2000, he performed various legal services for Ronald Scalzo, a self-employed remodeling contractor. In early 2000, Scalzo was experiencing difficulties meeting his financial obligations, including one to the plaintiff, who previously had supplied building materials to Scalzo on credit. Scalzo, on the defendant's advice, began to contemplate declaring bankruptcy. As to real property

---

[2] General Statutes § 37-3a (a) provides in relevant part that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ."

in which Scalzo held an ownership interest, the defendant advised him to "get off of the deeds."[3]

As of February 17, 2000, Scalzo owed the plaintiff $43,935.44 and was delinquent on his account. In exchange for the plaintiff's agreement to refrain from pursuing collection of this debt and to waive accruing interest,[4] Scalzo promised to give the plaintiff a mortgage on property that he owned, jointly with Steven Martino, at 37 Padanaram Road in Danbury (Padanaram Road property). Scalzo told the plaintiff that there was sufficient equity in the Padanaram Road property to secure his debt, that there was a buyer for the property and that the plaintiff would be paid in full at the closing.[5] Also on February 17, 2000, Scalzo signed a letter reciting this agreement.[6] On March 7, 2000, however, prior to executing any note or mortgage and unbeknownst to the plaintiff, Scalzo quitclaimed his interest in the Padanaram Road property to Martino.[7] Around the same time, Scalzo also quitclaimed his interest in his personal residence to his wife.

In April, 2000, the plaintiff's attorney, Marcus G. Organschi, prepared a note and mortgage on the Pada-

---

[3] Scalzo testified that, around this time, he had been discussing his precarious financial situation with the defendant because he had been falling into arrears on his taxes. According to Scalzo, the defendant "was saying that the best thing for [Scalzo] to do is to get off of the deeds and, you know, get out of this stuff now because we are going to end up filing bankruptcy and trying to liquidate anything that I can."

[4] Pursuant to the credit agreement between the plaintiff and Scalzo, interest accrued on unpaid balances at the rate of 1.5 percent per month.

[5] These representations were made by John Danise, Scalzo's stepbrother and business partner, who was authorized to act on Scalzo's behalf.

[6] According to Scalzo, the defendant had reviewed the wording of this letter.

[7] Scalzo testified that he told the defendant about his plan to quitclaim the Padanaram Road property to Martino, and the defendant advised him to go forth with it. Accordingly, Scalzo testified that as of March 7, 2000, the defendant was aware that Scalzo no longer had an ownership interest in the property.

naram Road property and sent them to the defendant to review on Scalzo's behalf. The two attorneys corresponded over a period of several weeks and negotiated certain revisions to the documents, which ultimately required Scalzo to satisfy his indebtedness to the plaintiff by September 1, 2000. During the course of these negotiations, the defendant told Organschi that there was more than $100,000 of equity in the property, that there was a buyer for the property and that a sale was forthcoming. The defendant further told Organschi that, although Scalzo previously "had been playing fast and loose with his finances," he had been receiving help with his accounting, was collecting on his receivables and was in "pretty good shape financially . . . ." On June 8, 2000, the defendant directed Scalzo to execute the note and mortgage, and on the same day, the defendant forwarded those documents to Organschi.[8]

---

[8] Scalzo testified about his conversations with the defendant around the time the note and mortgage were negotiated and executed. He repeatedly stated that the defendant knew that Scalzo did not own the property. Scalzo testified: "We had looked at these documents and they had gone back and forth from [the defendant] to . . . Organschi's office . . . . And [the defendant] had viewed everything, changed a couple of things, and then we had discussed what this was going to do. It was going to buy us time before signing this. And I discussed with him, I said, what are the ramifications, we don't own the property? It was quitclaimed over to [Martino] at this point now. And he said that that wasn't our responsibility to do the title search, it was theirs, so we were not doing anything wrong, you can go ahead and sign the deed, you know, knowing that I didn't own the property." According to Scalzo, the defendant advised him "that it was just like selling the Brooklyn Bridge a few times." When asked whether he had discussed with the defendant any arrangements for paying the plaintiff what was owed, Scalzo answered: "Yes, we did discuss it. We weren't going to make any payments. We were going to hold them off as long as we could. [The defendant] said that, you know, we'll . . . take it a step at a time and hold them off as long as we can on collection." Scalzo further testified that "[i]t was to keep everything at bay until we could file bankruptcy. I was told it was a strategic move that was legal, because we weren't the ones responsible for having to perform a title search, and we did not draw up the mortgage, and we did not draw up the agreement or the note. That's what I was told."

In August, 2000, the defendant referred Barry Miller, another of his clients, to Martino because Miller was interested in renting or purchasing a property similar to the Padanaram Road property. On August 30, 2000, Miller offered to purchase the Padanaram Road property for $300,000, and Martino accepted that offer. Martino and Miller then entered a sale-purchase agreement with a closing date of April 2, 2001, and Miller commenced substantial renovations to the property. Meanwhile, the due date on the note from Scalzo to the plaintiff passed without Scalzo making any payment on that note.

On October 11, 2000, the defendant called Organschi and notified him that he had "good news and bad news." The good news was that the Padanaram Road property was about to be sold, but the bad news was that a title search had revealed that Scalzo did not own the property, and further, that he had not owned it at the time he executed the mortgage and note to the plaintiff. The defendant told Organschi that Scalzo was deeply indebted to the Internal Revenue Service and "basically had no intention of paying [the plaintiff]."

On November 8, 2000, the plaintiff sent Scalzo a letter, notifying him of his default and demanding repayment. Scalzo did not respond. Accordingly, on December 18, 2000, the plaintiff filed in the Superior Court an application for an ex parte temporary restraining order barring a closing on the Padanaram Road property and for a prejudgment remedy, preliminary to bringing an action against Scalzo and Martino alleging fraud, fraudulent transfer and unfair trade practices. The court issued the requested temporary restraining order, and it scheduled a hearing on the plaintiff's request for a prejudgment remedy. On February 2, 2001, before that hearing was held, Scalzo filed for bankruptcy, resulting in a stay of the Superior Court action. On February 26, 2001, Miller filed in the Danbury land records a mechanic's

lien in the amount of $76,468, relating to the renovations at the Padanaram Road property.

On October 24, 2001, the plaintiff and Scalzo agreed to a stipulated judgment in an adversarial proceeding the plaintiff had commenced in the bankruptcy action. Pursuant to that stipulation, Scalzo's debt of $43,935.44 was declared nondischargeable, and the plaintiff agreed to withdraw its Superior Court action against Scalzo and Martino and to release the mortgage on the Padanaram Road property. The Superior Court action was withdrawn on December 17, 2001. The Padanaram Road property ultimately was sold to Miller in January, 2002.

During the course of the bankruptcy proceedings, Organschi had learned from Scalzo what the defendant had known about the ownership of the Padanaram Road property in early 2000. Consequently, on September 12, 2001, the plaintiff filed the present action against the defendant, raising claims of fraud, tortious interference with contractual relations and conspiracy. As to fraud, the plaintiff alleged that the defendant, through his knowing misrepresentations and nondisclosures surrounding Scalzo's execution of the note and mortgage, had induced the plaintiff to refrain from otherwise obtaining security for its debt or taking alternative steps to collect the amount owed, resulting in damages of "$43,935.44 plus interest of $12,234.68 accrued through August 2001 plus accruing interest, attorney's fees, and the costs of collection." As to tortious interference with contractual relations, the plaintiff alleged that the defendant, in negotiating the note and mortgage, had interfered with the relationship between the plaintiff and Scalzo and their credit agreement by arranging for Scalzo to shirk his obligations under that agreement. Finally, the plaintiff alleged that the defendant had conspired with Scalzo to defraud the plaintiff.

A jury trial held on multiple days in September, 2004, resulted in a verdict in favor of the plaintiff on all three

counts. The jury awarded the plaintiff a total of $55,500 in compensatory damages, the components of which were not specified. In response to interrogatories, the jury found that the defendant had acted with reckless indifference to the plaintiff's rights or had committed an intentional and wanton violation of those rights, that the defendant's conduct amounted to the wrongful detention of money due to the plaintiff and that the wrongful detention had commenced on April 17, 2000.

Following the jury's verdict, the plaintiff filed motions for prejudgment interest pursuant to § 37-3a, exemplary damages and offer of judgment interest pursuant to General Statutes (Rev. to 2001) § 52-192a, as amended by No. 01-71 of the 2001 Public Acts (P.A. 01-71).[9] The defendant objected to each of the plaintiff's motions, and he filed motions to set aside the verdict and to have judgment rendered in accordance with a previously filed motion for a directed verdict. In a March 30, 2005 memorandum of decision, the court granted each of the plaintiff's motions and denied both of the defendant's motions.

As to § 37-3a interest, the court, on the basis of the jury's findings that the defendant had conspired with Scalzo to deprive the plaintiff of money owed and that the defendant's conduct amounted to the wrongful detention of money, awarded the plaintiff $12,000.[10] As

[9] Pursuant to § 52-192a, a plaintiff in a civil action seeking money damages, prior to trial and within a certain time frame, may make a written offer of compromise to the defendant proposing to settle the claims underlying the action for a sum certain. If, after trial, the plaintiff has recovered an amount equal to or greater than the amount specified in the plaintiff's offer of compromise, the plaintiff may recover interest on that amount. See General Statutes (Rev. to 2001) § 52-192a (b), as amended by P.A. 01-71 (permitting interest of 12 percent), now codified at General Statutes § 52-192a (c) (permitting interest of 8 percent). In the present action, the plaintiff, within the specified time frame, had offered to settle its claims against the defendant for the sum of $75,000, and the defendant refused that offer.

[10] Although the jury found that the wrongful detention of money had commenced on April 17, 2000, the court based its award of § 37-3a interest on the wrongful detention having commenced on September 1, 2000, the

to exemplary damages, the court, on the basis of the jury's finding that the defendant had acted with reckless indifference toward, or intentionally and wantonly violated, the plaintiff's rights, awarded $22,500, which represented the plaintiff's attorney's fees pursuant to a contingency agreement with its counsel.[11] Finally, because the jury's award of compensatory damages, as supplemented by the court's awards of § 37-3a interest and exemplary damages, exceeded the plaintiff's offer of judgment, the court awarded $32,400 pursuant to § 52-192a.[12] Thereafter, the court rendered judgment in accordance with the jury's verdict, as supplemented by the court's awards of exemplary damages and interest.

On May 4, 2005, the court granted the plaintiff's request for an attachment of the defendant's property in the amount of the judgment[13] pending the defendant's appeal.[14] On May 9, 2005, the defendant filed a motion to open and set aside the judgment, in arrest of judg-

date by which Scalzo was to have repaid its debt to the plaintiff pursuant to the note and mortgage. The jury's finding apparently was disregarded. In awarding § 37-3a interest, the court rejected the defendant's arguments that the plaintiff had pleaded insufficiently a claim for such interest, that there was no evidence the defendant had withheld money from the plaintiff and that equitable principles did not support an award of § 37-3a interest.

[11] The amount represents one third of the jury's damages award as supplemented by the court's award of § 37-3a interest. The court rejected the defendant's claims that evidentiary support was lacking for the jury's underlying finding and in regard to the necessity, value and reasonableness of the plaintiff's attorney's fees.

[12] The defendant's objection to § 52-192a interest, which was premised on the success of arguments made in his other motions and objections, was overruled.

[13] The court rendered judgment awarding a total of $121,900 in damages. It appears that the court made a mathematical error, because the jury's award of $55,500, combined with the court's awards of exemplary damages of $22,500, § 37-3a interest of $12,000 and § 52-192a interest of $32,400, totals $122,400. The plaintiff has not raised any claim on appeal relating to this $500 discrepancy.

[14] The defendant filed his first appeal, from the judgment rendered in accordance with the jury's verdict and the court's March 30, 2005 memorandum of decision, on May 9, 2005. That appeal is docketed as SC 18021.

ment, or, in the alternative, for a rectification of judgment or remittitur[15] (motion to open). On May 9, 2005, he also filed a motion for reargument and reconsideration of the court's order granting the plaintiff's motion for an attachment.

During a hearing, held on May 31, 2005, the court repeatedly indicated that it was considering only the defendant's motion for reargument and reconsideration of the attachment, and that the motion to open would be heard at a later date. At the hearing, the defendant argued, inter alia, that subsequent to the conclusion of the trial, but prior to the court's consideration of the various postverdict motions, the plaintiff had received a payment of $15,283.91 from Scalzo's bankruptcy estate, representing a partial recovery of Scalzo's debt to the plaintiff, and, therefore, the jury's verdict, and by extension the attachment, should be reduced.[16] Moreover, because the reduction in the verdict necessitated a corresponding reduction in the award of exemplary dam-

---

[15] Also on May 9, 2005, the defendant filed a motion to reargue all of the postverdict motions. In the accompanying memorandum, he raised a number of entirely new arguments relating to the court's awards of interest and exemplary damages, and also to the merits of the claims on which the plaintiff had prevailed at trial. The court denied this motion without opinion on May 10, 2005, and the defendant did not appeal from that order.

[16] The plaintiff's recovery from Scalzo's bankruptcy estate, and the circumstances surrounding that recovery, were the main focus of the defendant's motion to open, wherein the defendant sought, inter alia, a reduction of the judgment. Documents attached to that motion indicate that, on April 20, 2004, several months before trial, the bankruptcy trustee had notified the plaintiff and other creditors of a possible distribution of funds due to the trustee's recovery of assets. The notice does not indicate the extent of the recovery or the amount of the expected distribution. In response, the plaintiff filed a proof of claim by which it sought recovery of Scalzo's nondischargeable debt and some of the accrued interest on that debt. The trustee's final report, which indicates that he had recovered $125,000, was filed with the bankruptcy court on December 6, 2004, after the trial in the present matter had concluded but before the court ordered supplemental awards of interest and exemplary damages. On January 24, 2005, the trustee distributed $15,283.91 to the plaintiff in partial satisfaction of its claim in that action.

ages; see footnote 11 of this opinion; the plaintiff's total damages no longer equaled or exceeded the $75,000 offer of judgment and were insufficient to trigger § 52-192a interest; see footnote 9 of this opinion; thus warranting a further reduction in the amount of the attachment. Following the hearing, the court issued an order, dated May 31, 2005, which stated as follows: "The jury verdict [of $55,500] is offset by $15,283.91. Accordingly, the judgment is recalculated as follows: Verdict: $40,216.09; Interest § 37-3a: $12,000; Exemplary Damages: $17,231.31; Interest § 52-192a: $0; Total: $69,447.40. Accordingly, the attachment is reduced to $70,000."[17]

On July 18, 2005, the court held a hearing on the defendant's motion to open. In that motion, the defendant argued that, because the bankruptcy proceedings had been ongoing at the time of trial and because the plaintiff's counsel had not informed the court of that circumstance and the ultimate recovery from Scalzo's bankruptcy estate, the judgment should be set aside as the product of an unripe, nonjusticiable claim, or reduced because it was substantially inflated. At the hearing, the defendant's counsel also alluded to Scalzo's allegedly improper behavior during the course of the bankruptcy proceedings, specifically, to the circumstances surrounding the stipulated judgment in the bankruptcy action, the withdrawal of the Superior Court action against Scalzo and Martino, and the possible involvement of the plaintiff in the alleged impropriety. Although defense counsel indicated that he had issued subpoenas and that he wanted to present witnesses and other evidence and to pursue further discovery, the court did not allow the defendant to do so or

---

[17] On June 17, 2005, the plaintiff filed its appeal from the court's May 31, 2005 order. That appeal is docketed as SC 18022.

to make any evidentiary proffer. Following the hearing, the court denied the defendant's motion to open.[18]

In a subsequent articulation, the court disagreed with the defendant's claim that the pending bankruptcy proceedings deprived it of subject matter jurisdiction, because the bankruptcy at issue was that of a nonparty. The court stated further that it had declined to open the judgment because the jury's verdict was not contrary to law or against the weight of the evidence and, therefore, the defendant's motion was baseless. In a supplemental articulation,[19] the court noted that, as to the issue of whether the pending bankruptcy proceeding deprived it of subject matter jurisdiction, there were no disputed issues of fact that would warrant an evidentiary hearing. As to the defendant's allegation that the plaintiff's counsel had committed a fraud upon the court in regard to the status of the bankruptcy proceeding and the receipt of funds from Scalzo's bankruptcy estate, the court stated that the defendant had had access to the entire bankruptcy file at the time of trial by way of subpoena or due to his own status as a creditor in the bankruptcy action and that evidence and testimony in regard to the bankruptcy had been admitted at trial. The court noted further that the plaintiff's counsel had conceded that the plaintiff had received funds from the bankruptcy estate. Accordingly, the court considered the defendant's claim of fraud to be baseless. For the foregoing

[18] On August 5, 2005, the defendant filed his second appeal, from the court's order denying his motion to open. That appeal is docketed as SC 18023. Also on August 5, 2005, the defendant filed a motion to reargue his motion to open, which the court ultimately denied on September 14, 2006.

[19] On November 9, 2006, the defendant filed with the Appellate Court a motion for review of the trial court's first articulation. On February 13, 2007, the Appellate Court granted the relief requested to the extent that the defendant sought articulation of the trial court's refusal to allow the defendant to present additional evidence at the July 18, 2005 hearing on the defendant's motion to open. The trial court filed its supplemental articulation on May 9, 2007.

reasons, the court denied the defendant's motion to open as well as his request for an evidentiary hearing.

On July 29, 2005, the defendant filed a supplemental motion to open and set aside the judgment, in arrest of judgment, or in the alternative, for a rectification of judgment or remittitur (supplemental motion to open). He requested oral argument and to present testimony. In his supplemental motion to open, the defendant essentially pressed his claim that the plaintiff or its counsel had perpetrated a fraud on the court by not apprising it of the bankruptcy distribution. He further alluded to the plaintiff's purported collusion with Scalzo and Scalzo's bankruptcy counsel in connection with the withdrawal of the plaintiff's Superior Court action against Scalzo and Martino and the subsequent sale of the Padanaram Road property to Miller, and he alleged that the plaintiff had received an unspecified payment from the proceeds of the closing on that property in exchange for that collusion. The defendant stated that he wished to present evidence in support of that claim. The court denied the defendant's motion on September 14, 2006, and, in a May 8, 2007 memorandum of decision,[20] stated that the defendant's supplemental motion to open had not set forth any new arguments or claims that had not been included in his motion to open and, therefore, had been denied for the same reasons as the motion to open.[21]

---

[20] On October 24, 2006, the defendant requested that the trial court articulate the basis for its September 14, 2006 denial of his supplemental motion to open, and the trial court denied that request. On November 24, 2006, the defendant filed with the Appellate Court a motion for review of the trial court's denial of an articulation. On February 13, 2007, treating the defendant's motion for review as a motion for compliance with Practice Book § 64-1, the Appellate Court ordered the trial court to file either a written memorandum of decision or a signed transcript containing its reasons for denying the defendant's supplemental motion to open. The trial court filed its May 8, 2007 memorandum of decision in response to that order.

[21] On October 3, 2006, the defendant filed his third appeal, from the court's order denying his supplemental motion to open. On May 23, 2007, he amended that appeal to include a challenge to the May 8, 2007 memorandum of decision. That appeal is docketed as SC 18026.

On September 29, 2006, while these appeals were pending at the Appellate Court, the defendant filed a motion to dismiss the plaintiff's appeal on the grounds that it was not taken from a final judgment, or alternatively, was jurisdictionally late. On October 11, 2006, the defendant filed a motion to consolidate his three appeals, which the Appellate Court granted. On December 20, 2006, the Appellate Court denied the defendant's motion to dismiss the plaintiff's appeal without prejudice to the defendant raising his jurisdictional claims before the panel considering the appeal on its merits. We subsequently transferred the plaintiff's appeal and the defendant's consolidated appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1, and all four appeals were argued together on January 9, 2008. We now turn to the claims raised.

The defendant claims that the trial court: (1) lacked subject matter jurisdiction over this action because, until Scalzo's bankruptcy proceeding concluded, the plaintiff's claims were not ripe for adjudication; (2) improperly declined to open and to set aside the judgment, in whole or in part, because (a) the judgment violates public policy by imposing on an attorney a duty to a nonclient, (b) the judgment is contrary to applicable law governing the causes of action at issue and (c) the defendant's conduct, even if improper, did not cause the plaintiff's damages; (3) improperly refused to conduct an evidentiary hearing in connection with the defendant's motion to open; and (4) improperly awarded interest pursuant to § 37-3a. The plaintiff claims that the trial court improperly: (1) reduced the jury's award of compensatory damages by the amount the plaintiff ultimately recovered from the bankruptcy estate of Scalzo; and (2) reduced the award without affording the plaintiff proper notice and the opportunity to argue that modification of the damages award was unwarranted.

# I

## JURISDICTIONAL CLAIMS

We address the defendant's ripeness claim first because it implicates subject matter jurisdiction and, thus, presents a threshold issue. For the same reason, we then address the defendant's jurisdictional challenge to the plaintiff's appeal, which he raised initially in the motion to dismiss filed with the Appellate Court and continues to press in his brief filed in SC 18022. See footnote 1 of this opinion. Thereafter, we will consider the substantive claims raised in the parties' appeals.

## A

The defendant claims that the trial court lacked subject matter jurisdiction over the plaintiff's claims because, at the time of trial, those claims were not ripe and, therefore, were not justiciable. He argues that the pendency of the bankruptcy proceedings against Scalzo, specifically, the bankruptcy trustee's ongoing efforts to recover an asset that Scalzo improperly had transferred prior to declaring bankruptcy, rendered the plaintiff's damages claims speculative and uncertain and, consequently, deprived the trial court of jurisdiction to proceed until the bankruptcy proceedings concluded. We are not persuaded.[22]

---

[22] The defendant also argues, as part of his jurisdictional claim, that the failure of the plaintiff's counsel to apprise the trial court of developments in the bankruptcy proceedings and the possibility of a partial recovery constituted an ethical violation of the duty of candor toward the tribunal. See Rules of Professional Conduct 3.3. Even if this argument had merit, despite the trial court's conclusion to the contrary, the court's jurisdiction over the plaintiff's claims is not implicated by counsel's purported failure to disclose the circumstances that allegedly precluded ripeness. In other words, the plaintiff's claims either were ripe or they were not, regardless of the plaintiff's counsel's candor or lack thereof. Although counsel should have apprised the court of the plaintiff's partial recovery at the time it was received, we disagree that this omission affected the integrity of the judgment so as to warrant vacating that judgment, which the defendant alternatively requests. See, e.g., *Gum v. Dudley*, 202 W. Va. 477, 484–85, 505 S.E.2d 391 (1997) (upholding trial court's denial of plaintiff's motion for new trial,

The defendant questions the justiciability of the plaintiff's claims at the time of trial. "[J]usticiability comprises several related doctrines, namely, standing, *ripeness*, mootness and the political question doctrine, that implicate a court's subject matter jurisdiction and its competency to adjudicate a particular matter." (Emphasis added.) *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 569, 858 A.2d 709 (2004). "A case that is nonjusticiable must be dismissed for lack of subject matter jurisdiction." *Mayer* v. *Biafore, Florek & O'Neill*, 245 Conn. 88, 91, 713 A.2d 1267 (1998). "[B]ecause an issue regarding justiciability raises a question of law, our appellate review [of the defendant's ripeness claim] is plenary." *Office of the Governor* v. *Select Committee of Inquiry*, supra, 569.

"[T]he rationale behind the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . ." (Internal quotation marks omitted.) Id., 570. Accordingly, in determining whether a

despite defense counsel's failure to disclose codefendants' agreement to settle cross claim, because plaintiff failed to show that nondisclosure affected verdict). Rather, our resolution of the plaintiff's appeal compels the opposite conclusion, namely, that any delay in disclosure was harmless.

The defendant argues further that even though he raised this claim post-trial in his motion to open, the court was obligated to consider it because it implicated the court's subject matter jurisdiction. We agree that the issue of subject matter jurisdiction may be raised at any stage of the proceedings; see *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 287–88, 933 A.2d 256 (2007); and that once a jurisdictional claim is raised, "the court must fully resolve it . . . ." (Internal quotation marks omitted.) *Milford Power Co., LLC* v. *Alstom Power, Inc.*, 263 Conn. 616, 624–25, 882 A.2d 196 (2003). The defendant's argument lacks merit, however, because the trial court considered and rejected the defendant's jurisdictional claim, as evidenced by the court's two articulations issued in regard to its denial of the defendant's motion to open. Although we disagree with the defendant's claim for reasons somewhat different from those offered by the trial court, it is well established that we may sustain a judgment on an alternate ground having support in the record. *DeMilo & Co.* v. *Commissioner of Motor Vehicles*, 233 Conn. 281, 295, 659 A.2d 162 (1995).

case is ripe, a trial court "must be satisfied that the case before [it] does not present a hypothetical injury or a claim contingent upon some event that has not and indeed may never transpire." (Internal quotation marks omitted.) Id.

According to the defendant, the extent of the plaintiff's damages was unknown when the plaintiff commenced this litigation. Specifically, the defendant argues, because the bankruptcy trustee was pursuing a fraudulent transfer claim against Scalzo in connection with Scalzo's transfer of his interest in his personal residence, there remained the possibility that the plaintiff would collect on its debt, the alleged loss of which formed the basis of its claims against the defendant in the present action. The defendant claims that the plaintiff's posttrial, partial recovery of this debt from the bankruptcy trustee in January, 2005, undermined the jury's findings as to compensatory damages and, therefore, demonstrates that the plaintiff brought its claims prematurely. We disagree.

Although the exact amount of the plaintiff's damages might have remained uncertain when it commenced this action, it nevertheless was abundantly clear that the plaintiff had sustained *some* damages and that there was no hope of a full recovery from Scalzo.[23] Pursuant to Connecticut's ripeness jurisprudence, as long as it is clear that a plaintiff has suffered an injury sufficient to give rise to the cause of action alleged, a lack of

[23] Scalzo's original bankruptcy petition listed total assets of $25,725 and total liabilities, secured and unsecured, of $969,274.47. There is no indication in the record that the bankruptcy trustee was pursuing recovery of any other fraudulently transferred assets aside from Scalzo's share in his personal residence. As to that asset, the trustee ultimately recovered only $125,000 to distribute to creditors, with trustee fees and tax liabilities receiving priority over debts such as that owed to the plaintiff. Given the foregoing, there was no way the plaintiff could have recovered from Scalzo's bankruptcy estate the entirety of its debt, plus accrued interest, as sought in its complaint against the defendant.

certainty as to the precise scope of damages will not prevent the claim from being justiciable. See *Cumberland Farms, Inc.* v. *Groton*, 247 Conn. 196, 211–14, 719 A.2d 465 (1998); *Mayer* v. *Biafore, Florek & O'Neill*, supra, 245 Conn. 90–92; *Weiner* v. *Clinton*, 100 Conn. App. 753, 757–63, 919 A.2d 1038, cert. denied, 282 Conn. 928, 926 A.2d 669 (2007). In *Cumberland Farms, Inc.* v. *Groton*, supra, 198–99, a plaintiff landowner brought an inverse condemnation action against a municipality, arguing that the municipality's denial of a variance had destroyed the value of the plaintiff's real property and, therefore, that the plaintiff was entitled to just compensation for the regulatory taking of that property. The Appellate Court concluded that the inverse condemnation action had been brought prematurely because the plaintiff's administrative appeal from the denial of its variance request remained pending, and, consequently, the extent of its damages was unknown. Id., 200. We disagreed and reversed the decision of the Appellate Court. Id., 202. Specifically, we disagreed that the fact that the plaintiff potentially could prevail in the administrative appeal, thereby eliminating its right to damages, rendered the plaintiff's takings claim speculative. Id., 211–12. We reasoned that, even if the plaintiff's administrative appeal ultimately was successful, the plaintiff still would be entitled to some compensation for the temporary taking it had suffered during the pendency of that appeal. Id., 208, 212. In other words, even though it was unclear at the outset of the inverse condemnation action whether the plaintiff's damages claim was for a temporary or complete taking, the claim nevertheless was ripe and capable of resolution on the merits.

Similarly, the Appellate Court recently rejected a claim that a pending appeal from the entry of a default judgment against a plaintiff client rendered premature the plaintiff's malpractice claim against the defendants, an attorney and law firm whose negligence allegedly

had caused that default. *Weiner* v. *Clinton*, supra, 100 Conn. App. 755–56. Although the trial court determined that it lacked jurisdiction because "the pendency of the appeal rendered it 'impossible' to determine damages"; id., 756; the Appellate Court explained that "[a] claim's justiciability is wholly separate from its merits. . . . As such, an inability to establish the exact amount of damages is indicative of a defect in a plaintiff's capacity to prove his or her case, not of a deficiency in the court's subject matter jurisdiction." (Citation omitted.) Id., 760; see also *Vanderweyst* v. *Boudreaux*, Texas Court of Appeals, First District, Docket No. 01-02-00928-CV (October 2, 2003) (damages claim, though speculative, was "fodder for a summary judgment motion, not a dismissal for lack of ripeness in a plea to the [trial court's] jurisdiction"). In light of the foregoing authority, we conclude that even though the amount of the plaintiff's injury was not known with certainty, that circumstance did not render its claims against the defendant unripe and nonjusticiable.[24]

---

[24] The defendant argues that the case of *Bankers Trust Co.* v. *Rhoades*, 859 F.2d 1096 (2d Cir. 1988), cert. denied sub nom. *Soifer* v. *Bankers Trust Co.*, 490 U.S. 1007, 109 S. Ct. 1642, 104 L. Ed. 2d 158 (1989), is directly on point and warrants the opposite conclusion. In *Bankers Trust Co.*, a plaintiff creditor brought a civil RICO action; see 18 U.S.C. §§ 1964 (c) and 1962; against officers of a debtor corporation, alleging that the officers fraudulently had depleted assets of the corporation prior to its undergoing a reorganization in bankruptcy. *Bankers Trust Co.* v. *Rhoades*, supra, 1098. Believing the defendants' misrepresentation that all of the corporation's assets were available in the bankruptcy proceeding, the plaintiff had agreed to accept in repayment only 17.5 percent of its allowed claim. See id., 1098–99. When the defendants' malfeasance was uncovered, the bankruptcy proceedings were reinstated so that the trustee could seek recovery of the depleted assets. Due to the pendency of those proceedings and the possibility of recovery, the court concluded that the plaintiff's claims were premature. Id., 1106.

We disagree that the holding in *Bankers Trust Co.* controls the outcome of the present action. First, decisions of the Second Circuit Court of Appeals, although often persuasive, are not binding on this court; see *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000); particularly when they conflict with our own precedent. Second, *Bankers Trust Co.* is factually distinguishable. Specifically, the fraudulent transfers at issue were numer-

We note finally that the plaintiff's complaint alleged additional injuries that could not have been remedied by a recovery in the bankruptcy court, namely, the costs of collection expended in pursuance of Scalzo. Consequently, even if the plaintiff could have recovered the entirety of the debt in the bankruptcy proceedings, it had alleged additional actionable injuries stemming from the defendant's conduct such that its causes of action would have remained viable. See *Weiner* v. *Clinton*, supra, 100 Conn. App. 760 (plaintiff's claimed injuries included expenses associated with appealing default judgment, which would have remained even if default judgment was reversed, and thus, "were by no means hypothetical" [internal quotation marks omitted]); see also *Knight* v. *Furlow*, 553 A.2d 1232, 1235 (D.C. 1989) (legal fees and costs expended as result of attorney's alleged malpractice in drafting will constituted actionable harm, rendering malpractice action ripe, despite fact that case contesting will was still pending).

On the basis of the foregoing analysis, we conclude that the plaintiff's claims were justiciable despite the pendency of the bankruptcy proceedings and, therefore, that the court had jurisdiction to consider those claims. Accordingly, the defendant's first jurisdictional challenge must fail.

B

The defendant also claims that the plaintiff's appeal should be dismissed for lack of subject matter jurisdiction. According to the defendant, the May 31, 2005 order from which the plaintiff has appealed, did not reflect an opening and alteration of the judgment, but rather,

---

ous, complex and involved major assets, and the bankruptcy proceeding was a reorganization of the debtor corporation rather than a complete liquidation of its assets, which made it quite plausible that the plaintiff ultimately might recover its debt. The plaintiff's damages, therefore, were considerably more speculative and uncertain than the plaintiff's damages in this case.

merely reduced the earlier attachment order. Consequently, the defendant argues, the plaintiff's appeal from the May 31, 2005 order was not brought from a final judgment. We disagree with the defendant's characterization of the court's order and, therefore, reject his jurisdictional claim.[25]

Because "[t]he construction of a judgment is a question of law for the court"; *Lashgari* v. *Lashgari*, 197 Conn. 189, 196, 496 A.2d 491 (1985); our review of the defendant's claim is plenary. "As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that

---

[25] The defendant argues alternatively that, to the extent that the appeal raises any challenge to the court's reduction of the attachment, it is jurisdictionally late pursuant to General Statutes § 52-278*l*, which provides in relevant part that "(a) [a]n order . . . (2) granting or denying a motion to dissolve or modify a prejudgment remedy under section 52-278e . . . shall be deemed a final judgment for purposes of appeal. . . ." Subsection (b) of § 52-278*l* provides that "[n]o such appeal shall be taken except within seven days of the rendering of the order from which the appeal is to be taken." The seven day time period provided in § 52-278*l* is subject matter jurisdictional. See *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 765–67, 628 A.2d 1303 (1993). According to the defendant, the plaintiff filed its appeal more than seven days after notice was given of the trial court's May 31, 2005 order and, therefore, any challenge to the modification of the attachment is jurisdictionally late.

Although it is not clear that § 52-278*l* applies to the modification of the attachment at issue here; see General Statutes § 52-278a (d) (defining " '[p]rejudgment remedy' " as, inter alia, attachment depriving defendant in civil action of use of property "*prior to final judgment*" [emphasis added]); General Statutes § 52-278e (concerning allowance of prejudgment remedies *without hearings*); we need not resolve that question because we disagree with the defendant's interpretation of the court's May 31, 2005 order as effecting only a reduction of the attachment. Moreover, the plaintiff in its appeal has not raised any claims pertaining to the modification of the attachment, but only to the modification of the *judgment*.

which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Citations omitted; internal quotation marks omitted.) Id., 196–97.

We reiterate the order at issue for clarity of analysis. The order stated: "[T]he jury verdict [of $55,500] is offset by $15,283.91. Accordingly, the judgment is recalculated as follows: Verdict: $40,216.09; § 37-3a Interest: $12,000; Exemplary Damages: $17,231.31; § 52-192a Interest: $0; Total: $69,447.40. Accordingly, the attachment is reduced to $70,000."

The defendant focuses on the concluding sentence of the court's order and certain of the surrounding circumstances, namely, that the court issued the order following a hearing that purportedly was held only to address the defendant's motion for a reduction of the attachment, and argues that they show that the order constitutes only a reduction of the attachment. He notes further that at a subsequent hearing, the court heard argument on, and then expressly denied, his motion to open, which would have been unnecessary and inconsistent had the court already decided the motion previously, at least partly in his favor. The defendant argues finally that the order does not state explicitly that it is opening the judgment and, if the plaintiff wished to pursue claims related to the order on appeal, it was obligated to seek an articulation as to the nature of the order, but failed to do so. We are not persuaded.

Although we agree that the trial court did not indicate at the hearing preceding the order that it was considering opening and modifying the judgment, the order, read as a whole, clearly indicates that the court did just that. In addition to its closing phrase, the order also states "[t]hat *the jury verdict is offset* by $15,283.91"

and that "*the judgment is recalculated* as follows"; (emphasis added); before setting out and totaling the various components of the damages award, three of which are altered as a result of the specified "offset." Our jurisprudence has established that when a trial court enters an order that substantively modifies a judgment, it necessarily has opened the judgment, regardless of whether that opening explicitly is acknowledged in the order. See *Commissioner of Transportation* v. *Rocky Mountain, LLC*, 277 Conn. 696, 705–707, 894 A.2d 259 (2006) (citing cases). Moreover, there would be no reason for the court to reduce the attachment in the absence of a corresponding reduction in the judgment that the attachment was intended to secure. See *Atlas Garage & Custom Builders, Inc.* v. *Hurley*, 167 Conn. 248, 251, 355 A.2d 286 (1974) ("[a]n attachment of property on mesne process is a mode of obtaining security for the satisfaction of any judgment which the plaintiff may finally recover" [internal quotation marks omitted]).

The fact that the court subsequently heard, and denied, the defendant's pending motion to open does not compel a different result. Rather, a more plausible explanation for the subsequent denial is that the court, because it already had opened the judgment, sua sponte, and had ordered some of the relief sought, i.e., a reduction of the judgment, considered moot the portion of the defendant's motion requesting that relief and denied the motion as to the remaining relief sought, i.e., a complete set aside of the judgment. On the basis of the foregoing analysis, we reject the defendant's claim that we lack jurisdiction over the plaintiff's appeal. We now turn to the substantive claims raised by the defendant in his three appeals.

## II

### THE DEFENDANT'S APPEALS
#### (SC 18021, SC 18023, SC 18026)[26]

#### A

The defendant raises a plethora of legal challenges to the jury's verdict. These claims, however, were not raised during trial or in the defendant's posttrial motions to set aside the verdict. Rather, the defendant raised these matters for the first time in either his motion to open or in his motion to reargue the postverdict motions, both of which were filed after judgment had been rendered.[27]

"The principles that govern motions to open or set aside a civil judgment are well established. Within four months of the date of the original judgment, Practice Book [§ 17-4] vests discretion in the trial court to determine whether there is a good and compelling reason for its modification or vacation. . . .

"Because opening a judgment is a matter of discretion, the trial court [is] not required to open the judgment to consider a claim not previously raised.[28] The

[26] For clarity, we address the defendant's remaining claims in the order in which they arose in the trial court proceedings, and not as they have been set forth in his brief.

[27] As previously noted, the court did not issue a memorandum of decision when it denied the defendant's motion to reargue, and, because the defendant did not appeal from this order, no decision or articulation was sought thereafter. Although the defendant sought and received an articulation in regard to the court's denial of his motion to open, he did not request articulation as to the claims at issue in this part of the opinion, and the trial court's reasoning for rejecting the claims at issue in this part is therefore unknown.

[28] Moreover, "[t]he purpose of a reargument is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts. . . . It also may be used to address . . . claims of law that the [movant] claimed were not addressed by the court. . . . [A] *motion to reargue* [*however*] *is not to be used as an opportunity to have a second bite of the apple* . . . ." (Emphasis added; internal quotation marks omitted.) *Gibbs* v. *Spinner*, 103 Conn. App. 502, 507, 930 A.2d 53 (2007).

exercise of equitable authority is vested in the discretion of the trial court and is subject only to limited review on appeal. . . . We do not undertake a plenary review of the merits of a decision of the trial court to grant or to deny a motion to open a judgment. The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action." (Citations omitted; internal quotation marks omitted.) *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 808–809, 695 A.2d 1010 (1997). In light of the extremely deferential standard of review governing the disposition of new claims raised posttrial and without the benefit of the trial court's reasoning as to those claims; see footnote 27 of this opinion; the defendant's arguments are entitled to brief consideration only.

1

The defendant claims that the judgment cannot stand because it is contrary to public policy. He argues specifically that the judgment, by faulting him for failing to disclose to the plaintiff that Scalzo did not own the property subject to the mortgage, improperly imposes a duty on an attorney to a nonclient. Aside from being untimely raised in the trial court, this claim is both sparsely briefed and wholly without merit. It therefore warrants little discussion.

However far the duty of an attorney to zealously represent his client extends, it necessarily falls short of the point at which the representation constitutes a fraud on a third party or the assistance in the perpetration of such a fraud, whether by affirmative misrepresentations or knowing nondisclosures. See Rules of Professional Conduct 1.2 (d) and 4.1. Moreover, this court's refusal to permit litigants to raise claims against

opposing counsel under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.; see, e.g., *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 729, 627 A.2d 374 (1993); cannot be construed, as the defendant suggests, as affording blanket immunity to attorneys for tortious acts they commit against third parties while representing clients. See, e.g., *Mozzochi* v. *Beck*, 204 Conn. 490, 497, 529 A.2d 171 (1987) (allowing, under certain circumstances, third party abuse of process claims against attorneys). Finally, this case is factually distinguishable from those in which attorneys inadvertently assisted clients in effecting fraudulent transfers. See, e.g., *Nastro* v. *D'Onofrio*, 263 F. Sup. 2d 446, 458–59 (D. Conn. 2003) (disallowing fraudulent transfer claim against attorney for mere preparation of legal documents). Rather, the evidence shows that the defendant negotiated, and directed his client to execute, a note and mortgage relating to property that the defendant knew the client did not own. The trial court did not abuse its discretion in declining to open and set aside the judgment on the basis of this claim.

2

The defendant next claims, for a variety of reasons, that the judgment against him cannot stand because it is contrary to the substantive law governing the causes of action alleged by the plaintiff.[29] All of these claims are meritless because they rest on an untenable premise.

In making these arguments, the defendant attempts to recast the plaintiff's claim of fraud as "in reality"

---

[29] The defendant claims that, pursuant to the law governing fraudulent transfer and conspiracy to commit fraudulent transfer: (1) he improperly was held liable for Scalzo's debt because he was not a transferee of the Padanaram Road property; (2) he improperly was held liable for punitive damages; (3) the plaintiff improperly was permitted to recover absent competent proof of equity in the Padanaram Road property; and (4) the jury improperly was permitted to consider the plaintiff's costs of collection expended in pursuing Scalzo as an element of compensatory damages.

one of fraudulent transfer, because the defendant's fraudulent statements and nondisclosures bore some relation to what purportedly was such a transfer from Scalzo to Martino. The two causes of action are, however, distinct; see *Weinstein* v. *Weinstein*, 275 Conn. 671, 685, 882 A.2d 53 (2005) (listing elements of fraud); General Statutes § 52-552e (defining fraudulent transfer); and the action alleged, argued and ultimately proven by the plaintiff was one of fraud.[30] Because the defendant through these claims sought to disprove allegations that the plaintiff had not made, the trial court did not abuse its discretion in rejecting them.[31]

3

The defendant claims further that the court should have opened and set aside the judgment because the plaintiff failed to prove that the defendant's conduct caused the plaintiff's damages. The defendant argues, in essence, that nothing he did could have altered the course of events that unfolded subsequent to Scalzo's

[30] Indeed, the defendant acknowledged as much in the memorandum of law that he submitted in support of his motion for judgment in accordance with his motion for a directed verdict, wherein he argued that the plaintiff had failed to prove each of the four elements of fraud.

[31] The defendant's claim that the court improperly allowed the jury to consider the costs of collection expended by the plaintiff pursuing Scalzo as an element of damages; see footnote 29 of this opinion; can be read as resting on general principles, in addition to the law of fraudulent transfer. As to that claim, the defendant argues that, because those costs consisted of legal fees, their allowance as damages ran afoul of the American Rule, which, in short, disallows the award of attorney's fees to a prevailing party absent contractual or statutory authorization or bad faith conduct by the opposing party or its counsel. See *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn. 576, 580–81, 923 A.2d 697 (2007). There is substantial authority, however, that attorney's fees incurred in other litigation against a third party, which are awarded as an element of compensatory damages, do not fall within the contemplation of the American Rule. See *Masonic Temple Assn.* v. *Indiana Farmers Mutual Ins. Co.*, 837 N.E.2d 1032, 1038–39 (Ind. App. 2005) (citing cases), reh. denied, 2006 Ind. App. LEXIS 416 (Ind. App. March 7, 2006). Accordingly, the court's refusal to open the judgment on the basis of this claim was not an abuse of discretion.

transfer of the Padanaram Road property. According to the defendant, pursuant to bankruptcy law, once Scalzo filed for bankruptcy, any potential fraudulent transfer claims against Scalzo arising from transfers occurring in the year prior, including those relating to the Padanaram Road property or Scalzo's personal residence, became the sole prerogative of the bankruptcy trustee. The defendant claims, therefore, that even if the plaintiff had not been misled by his misrepresentations and nondisclosures into sitting idle for the greater part of 2000, believing it had a valid mortgage on property that soon was to be sold, it would have been precluded from pursuing such claims itself. In other words, the result would have been the same. This argument is unpersuasive because it ignores the allegations of the plaintiff's complaint and the evidence presented at trial.

The theory on which the plaintiff alleged that it could have recovered from Scalzo, absent the defendant's fraud, was broader than the defendant's argument implies. Specifically, the plaintiff alleged that, "[i]n reliance upon the representations and nondisclosures of the defendant, [it] believed the note and mortgage to be valid and [therefore] did not take steps to obtain security or otherwise legally secure its right to be paid at closing *or take other steps to collect said money*, as a result of which, the plaintiff has been damaged . . . ." (Emphasis added.) The plaintiff alleged additionally that the defendant's conspiracy with Scalzo caused it to refrain from, inter alia, "obtaining security *on any other property of Scalzo* . . . ." (Emphasis added.)

The evidence presented at trial showed that Scalzo possessed substantial other assets during the year 2000 that the plaintiff might have pursued in collection of Scalzo's debt, and therefore, the jury reasonably could have concluded that, regardless of whether the plaintiff could have been repaid in full from the equity in the

two transferred real properties, it could have recovered otherwise.[32] We conclude that the court's refusal to open the judgment on the basis of this argument was not an abuse of discretion.

B

The defendant claims next that the trial court improperly awarded prejudgment interest to the plaintiff pursuant to § 37-3a because he personally did not wrongfully detain any money due to the plaintiff or renege on a promise to pay the plaintiff money.[33] According to the plaintiff, the defendant properly was held liable for interest on an amount due from Scalzo pursuant to the note that Scalzo fraudulently executed with the defendant's assistance. We agree with the plaintiff.

"The decision of whether to grant interest under § 37-3a is primarily an equitable determination and a matter lying within the discretion of the trial court. . . . In determining whether the trial court has abused its dis-

---

[32] For example, a disbursements journal reflecting Scalzo's cash flow in early August, 2000, shows deposits of $21,669.60 and $17,000, which an accountant's testimony indicated were installment payments Scalzo received for a job. That accountant also testified that around the same time, he visited Scalzo's home and viewed other assets, including a restored 1969 Corvette that Scalzo "had just bought." Moreover, Scalzo testified that the defendant had helped him sell his cabinet shop, after which Scalzo discovered that the defendant, contrary to Scalzo's wishes, had sold Scalzo's personal equipment as well. Scalzo's bankruptcy petition indicates that this sale occurred in August, 2000, and that the equipment at issue was worth $240,000.

[33] The defendant also argues that the date specified by the jury as the date on which the wrongful detention commenced—April 17, 2000—had no basis in the evidence. As previously noted, however, the plaintiff through its postjudgment motion for § 37-3a interest sought, and the court therefore awarded, only the interest accruing after September 1, 2000, the date on which Scalzo, pursuant to the note negotiated by the defendant, was to repay his debt to the plaintiff. See footnote 10 of this opinion. Accordingly, we need not consider this argument. We note that the defendant did not challenge the trial court's decision to award interest from a different date than that specified by the jury, and on appeal, he does not claim any impropriety in that action.

cretion, we must make every reasonable presumption in favor of the correctness of its action." (Citation omitted; internal quotation marks omitted.) *MedValUSA Health Programs, Inc.* v. *Memberworks, Inc.*, 273 Conn. 634, 666, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005). To the extent that the defendant is challenging the applicability of § 37-3a under the circumstances, however, our review is plenary. See *Tang* v. *Bou-Fakhreddine*, 75 Conn. App. 334, 346–47, 815 A.2d 1276 (2003).

The trial court awarded the plaintiff prejudgment interest on the basis of the jury's finding that the defendant had conspired with Scalzo to deprive the plaintiff of moneys that were owed to it. Pursuant to the allegations of the plaintiff's complaint, which the jury found to be proven, Scalzo and the defendant conspired fraudulently to induce the plaintiff to forgo collection efforts, and instead, to extend Scalzo's credit by means of the promissory note negotiated by the defendant. The evidence at trial indisputably showed that when that note matured, Scalzo failed to make any payment. Further, on the basis of Scalzo's testimony the jury reasonably could have found that on the defendant's advice, Scalzo had executed the note with the intention of defaulting.

Pursuant to Connecticut's jurisprudence, there is, precisely speaking, no independent claim for civil conspiracy.[34] "Rather, [t]he action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself." (Internal quotation

---

[34] "The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." (Internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 635–36, 894 A.2d 240 (2006).

marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 636, 894 A.2d 240 (2006). "[T]he purpose of a civil conspiracy claim is to impose civil liability for damages on those who agree to join in a tortfeasor's conduct and, thereby, become liable for the ensuing damage, simply by virtue of their agreement to engage in the wrongdoing." Id.; see also *Biro* v. *Hirsch*, 62 Conn. App. 11, 17, 771 A.2d 129 ("all conspirators are civilly liable for the damage resulting from any overt act committed by one of them pursuant to the combination" [internal quotation marks omitted]), cert. denied, 256 Conn. 908, 772 A.2d 601 (2001); 1 S. Speiser, C. Krause & A. Gans, American Law of Torts (2003) § 3:4, p. 405 ("[o]nce a conspiracy is proven, each co-conspirator is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination" [internal quotation marks omitted]).

"Under . . . § 37-3a, interest may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable. For example, interest is awarded at the maturity of a debt from the time the money becomes due." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 41, 664 A.2d 719 (1995); see also 47 C.J.S. 53, Interest and Usury § 40 (2005) ("detention of money . . . arises where a debt has become due and the debtor withholds payment without having the right to do so" [internal quotation marks omitted]).

Pursuant to the foregoing, we conclude that the trial court properly held the defendant liable for the interest accruing on Scalzo's debt after Scalzo failed to repay the plaintiff as he had agreed.[35] By agreeing to join

---

[35] It is of no consequence that the plaintiff, through this action, did not seek to collect on the note directly. When a creditor is induced through misrepresentations to make a loan, it may seek to recoup damages from the debtor either by an action on the note or by an action sounding in fraud. See, e.g., *Personal Finance Co.* v. *Lillie*, 129 Conn. 290, 291, 27 A.2d 794 (1942).

Scalzo's scheme to evade payment of his debt and by assisting him in perpetrating that scheme, the plaintiff thereby became liable for all of the ensuing damage, including the interest that, absent the defendant's assistance, only Scalzo would have owed.[36] Consequently, the defendant's claim is unavailing.

C

The defendant's last claim is that the trial court improperly refused to conduct an evidentiary hearing in connection with his motion to open or to allow him to make an evidentiary proffer. According to the defendant, the court's refusal to hold a hearing when there were disputed issues of fact was a due process violation, and further, the court had no discretion to disallow a proffer. Under the circumstances of this case, we conclude that the court's disallowance of an evidentiary hearing or proffer was not an abuse of discretion.

The following additional procedural history is relevant. In his motion to open, the defendant, in light of the plaintiff's recovery from the bankruptcy trustee and its failure to apprise the court of that recovery, enumerated two issues for the court's consideration: (1) whether the plaintiff's claims had not been ripe for adjudication; and (2) whether the judgment was "substantially inflated." The defendant, in his motion, did not state that the judgment was a product of fraud, nor did he request an evidentiary hearing or indicate that

---

[36] Prejudgment interest awarded pursuant to § 37-3a is in the nature of compensatory damages. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 41 ("[t]he purpose of an award of [§ 37-3a] interest is to compensate a party for a wrong" [internal quotation marks omitted]); see also *Flynn* v. *Kaumeyer*, 67 Conn. App. 100, 105, 787 A.2d 37 (2001) ("[p]rejudgment interest for money detained after it becomes due is compensatory because it compensates or reimburses plaintiffs for the interest they could have earned on the money that was rightfully theirs, but that was not paid when it became due"); see also 47 C.J.S. 126–27, supra, § 105 (same); Comment, "Interest as Damages in Connecticut," 30 Conn. B.J. 407, 411 (1956) (same).

testimony was required. His accompanying twenty-four page memorandum of law focused largely on the two issues identified in his motion, at times venturing into the arguments addressed in part II of this decision, but lacked any definitive allegation of fraud.[37] Although extensive documentation from Scalzo's bankruptcy file was appended to the memorandum, none of that documentation indicated that the plaintiff was complicit in any fraud.

At the outset of the July 18, 2005 hearing on the motion to open, the defendant's counsel informed the court that he had subpoenaed documents and witnesses and intended to present "several hours, maybe a half a day" of evidence. He subsequently indicated that, during his postjudgment exploration of the concluded bankruptcy proceedings, certain information had suggested to him that the plaintiff could have pursued its fraudulent transfer action against Scalzo in regard to the Padanaram Road property.[38] The defendant's counsel continued to discuss other "things that require I think some discovery," namely, the circumstances surrounding the plaintiff's withdrawal of its fraudulent transfer action against Scalzo and Martino following its stipulation with Scalzo in the bankruptcy proceedings. He further stated that he had obtained the closing file on the Padanaram Road property and that it indicated Scalzo's counsel was to receive some of the closing

---

[37] In the course of his ripeness arguments, the defendant accused the plaintiff of, at most, making disingenuous arguments at trial in light of the ongoing bankruptcy proceedings. Limited allusions to purported misconduct vis-á-vis the bankruptcy action concerned Scalzo, not the plaintiff.

[38] Apparently, the bankruptcy trustee had declined to pursue an action pertaining to the Padanaram Road property, likely because, by the time Scalzo filed for bankruptcy, it had no equity. There was evidence indicating that, at the time Scalzo quitclaimed his interest to Martino, there was approximately $60,000 of equity in the property. By the time Scalzo filed for bankruptcy, however, Miller had placed a mechanic's lien on the property in an amount exceeding that equity.

proceeds. Moreover, according to the defendant's counsel, but without elaboration, "[t]here was also some indication . . . that some money may have gone to [the plaintiff]." The defendant's counsel proceeded to pose a number of questions in regard to the plaintiff's motivations in withdrawing its action against Scalzo and Martino, then stated: "Those are all questions that I would submit need to be explored in connection with this motion to open."

In arguing his objection to the motion to open, the plaintiff's counsel denied defense counsel's vague allegations of wrongdoing and, otherwise, responded to the claims the defendant had made in his motion and memorandum of law. The plaintiff's counsel repeatedly noted that the defendant, who was a named creditor of Scalzo in the bankruptcy proceedings, had had full access to the bankruptcy file at all times.

The defendant's counsel, in reply, asked to present evidence, and the court denied that request. The defendant's counsel reiterated that Scalzo's counsel had received funds from the closing of the Padanaram Road property. He stated: "I need to present evidence. I need, based upon what I know so far, to take some discovery. I need to find out why [Scalzo's counsel] was looking to receive . . . proceeds from the closing of [the] Padanaram Road property. *All of this occurred several years before this case was tried in this court.*" (Emphasis added.)

The trial court again denied defense counsel's requests to present evidence and to make a proffer of evidence. It opined that counsel was attempting to retry a case that a jury already had decided, and was bringing up facts that could have been presented at trial. The court then denied the defendant's motion to open. In his subsequent motion to reargue that motion; see footnote 18 of this opinion; the defendant contested the

court's refusal to hold an evidentiary hearing. According to the defendant, at the July 18, 2005 hearing, he had "described for the [c]ourt facts that may constitute bankruptcy fraud, as well as evidence that the plaintiff in this case may have concealed facts relating to an additional recovery prior to trial and requested the opportunity to present evidence and to proffer evidence. Both requests were denied."[39] He did not state with specificity, however, what evidence he would have offered, nor did the motion include any exhibits. In his supplemental motion to open,[40] the defendant stated that he "has reason to believe and wishes to present evidence that after [the plaintiff] obtained judgment in the [b]ankruptcy [c]ourt, it did not . . . merely provide voluntarily and without further consideration, a [w]ithdrawal of its actions affecting the Padanaram Road property but that, [the plaintiff], Scalzo, Scalzo's counsel and/or others actually received payment and/or proceeds of the closing as consideration for their cooperation and actions in eliminating the temporary restraining order issued by this [c]ourt and releasing the supposedly worthless mortgage granted by Scalzo . . . ." Again, no particular evidence was identified or attached to the motion, which the court denied.

The defendant now claims that the testimony and evidence that he sought to present would have shown that the judgment was a product of fraud and was invalid as a matter of law, and that the court's disallow-

---

[39] The defendant further accused the plaintiff's counsel of lacking candor and stated that "[i]t would hardly be surprising, therefore, that if [the plaintiff] received recovery from another source—for example, a payment for a release of the mortgage from Scalzo that it claimed in this case was worthless—that [the plaintiff] also would rationalize incorrectly that there was no need to disclose such recovery to the [c]ourt. [The] [d]efendant desires to present evidence supporting such a scenario, but has been precluded from doing so."

[40] In the supplemental motion and the motion to reargue the motion to open, the defendant specified that testimony was required.

ance of a proffer was manifest error. He argues that he had "evidence to show that Scalzo knowingly had given false testimony at trial; that the paper transfer of Scalzo's interest in the Padanaram Road property was a sham; that Scalzo retained and benefited from a hidden interest in the property; and that the plaintiff may have been complicit in this scheme." According to the defendant, when there are disputed factual issues, as he contends there were here, given the plaintiff's denial of his allegations, due process requires a hearing. We disagree.

"Courts have an inherent power to open, correct and modify judgments. . . . A civil judgment of the Superior Court may be opened if a motion to open or set aside is filed within four months of the issuance of judgment." (Citations omitted; internal quotation marks omitted.) *Steve Viglione Sheet Metal Co.* v. *Sakonchick*, 190 Conn. 707, 710, 462 A.2d 1037 (1983); see also General Statutes § 52-211 (a); Practice Book § 17-4. "Once the trial court has refused to open a judgment, the action of the court will not be disturbed on appeal unless it has acted unreasonably and in clear abuse of its discretion." (Internal quotation marks omitted.) *Steve Viglione Sheet Metal Co.* v. *Sakonchick*, supra, 711. "In determining whether the trial court abused its discretion [in denying a motion to open], this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." (Citations omitted; internal quotation marks omitted.) *Gillis* v. *Gillis*, 214 Conn. 336, 340–41, 572 A.2d 323 (1990).

"A motion to open in order to permit a party to present further evidence need not be granted where the evidence offered is not likely to affect the verdict." *Steve Viglione Sheet Metal Co.* v. *Sakonchick*, supra, 190 Conn. 712. "Newly-discovered evidence which is

merely cumulative, or which impeaches the . . . credibility of a witness, will not suffice ordinarily to grant a new trial, and never unless it appears reasonably certain that injustice has been done in the judgment rendered, and that the result of a new trial will probably be different." (Internal quotation marks omitted.) *Dick* v. *Dick*, 167 Conn. 210, 227, 355 A.2d 110 (1974). When a party seeks to open and vacate a judgment based on new evidence allegedly showing the judgment is tainted by fraud, he must show, inter alia, that he was diligent during trial in trying to discover and expose the fraud, and that there is clear proof of that fraud. See *Varley* v. *Varley*, 180 Conn. 1, 4, 428 A.2d 317 (1980); see also 2 Restatement (Second), Judgments § 70 (2), p. 179 (1982); but see *Billington* v. *Billington*, 220 Conn. 212, 218–19, 595 A.2d 1377 (1991) (abandoning diligence requirement in context of marital dissolution actions).

These rules are motivated by the policy that "[o]nce a judgment [is] rendered it is to be considered final and it should be left undisturbed by post-trial motions except for a good and compelling reason." (Internal quotation marks omitted.) *TLC Development, Inc.* v. *Planning & Zoning Commission*, 215 Conn. 527, 533, 577 A.2d 288 (1990). Otherwise, "there might never be an end to litigation." (Internal quotation marks omitted.) *Buster* v. *Commissioner of Correction*, 26 Conn. App. 48, 52, 596 A.2d 943 (1991).

It is apparent from the record that the defendant did not make the showing necessary to warrant an opening of the judgment. The reasons for which he claims an opening of the judgment was required were not included in his motion to open, and were not accompanied by supporting evidence, but were articulated for the first time at the hearing on that motion. At that hearing, the defendant's arguments to the trial court were vague and rambling and, even with the benefit of a printed transcript, are difficult to understand. See 2

Restatement (Second), supra, § 70 (2) (b) (party seeking relief from judgment based on fraud must state claim "with such particularity as to indicate it is well founded"). To the extent the defendant's claims concerned alleged wrongdoings of Scalzo, whose credibility as a witness was strongly contested at trial, they did nothing to call into question the integrity of the verdict, even if they were well-founded. Importantly, as the trial court recognized and as the defendant's counsel admitted, the matters counsel wished to explore had occurred years before trial and were related to proceedings to which the defendant had had complete access. Accordingly, the defendant clearly had not exercised the requisite diligence in uncovering the purported malfeasance. See *Varley* v. *Varley*, supra, 180 Conn. 4; 2 Restatement (Second), supra, § 70 (2); see also *Damico* v. *Dalton*, 1 Conn. App. 186, 187–88, 469 A.2d 795 (1984) (upholding denial of motion to open based on newly discovered evidence where evidence "was just as much within the power of the defendant to produce before judgment as after").

In regard to the allegedly fraudulent conduct of the plaintiff, it is obvious from defense counsel's statements that the defendant had no evidence in support of his allegations, but rather, sought to go on a fishing expedition in the hope of discovering some. This is not a proper reason to hold a hearing on a motion to open a judgment. To be entitled to a hearing, the defendant needed to make some threshold showing that his claims had substance, which he failed to do. See *Brinley* v. *Ives*, 153 Conn. 718, 719, 220 A.2d 438 (1966) (concluding motion to open based on newly discovered evidence was "fatally defective in that it did not set forth who the witnesses were and what their testimony would be"); 2 Restatement (Second), supra, § 70, comment (d) ("party seeking relief must demonstrate, *before being allowed to present his case,* that he has a substantial

case to present" [emphasis added]). On the basis of the foregoing analysis, the defendant's final claim fails.

## III

### THE PLAINTIFF'S APPEAL
### (SC 18022)

### A

The plaintiff claims first that the trial court, in its May 31, 2005 order, improperly offset the jury's award of compensatory damages by $15,283.91, the amount recovered postjudgment by the plaintiff from Scalzo's bankruptcy estate. The defendant, conversely, argues that an offset was required, as a matter of law, to prevent the plaintiff from receiving a double recovery. We agree with the plaintiff.[41]

The trial court's order amounted to a remittitur of the jury's verdict, issued in response to claims raised by the defendant at the May 31, 2005 hearing.[42] The defendant argued at the hearing that if the court had been apprised of the plaintiff's bankruptcy recovery when it considered the plaintiff's postjudgment motions, it would have been legally obligated to offset the verdict by the amount received from the bankruptcy trustee. The court apparently agreed, because it reduced the verdict accordingly.

[41] In responding to the plaintiff's claim, the defendant repeats his argument that the plaintiff's counsel violated his duty of candor toward the court and implies that this violation necessitated a reduction of the judgment. We again reject the claim that any reduction of the verdict was warranted for this reason because, as our resolution of the plaintiff's claim makes clear, its counsel's failure to timely apprise the court of the bankruptcy recovery did not undermine the integrity of the judgment. See, e.g., *Gum* v. *Dudley*, 202 W. Va. 477, 484–85, 505 S.E.2d 391 (1997).

[42] Although the May 31, 2005 hearing purportedly concerned only the defendant's motion to reduce the plaintiff's attachment, the defendant's arguments on that matter necessarily rested on the claims raised in his motion to open, wherein he requested, inter alia, a remittitur of the verdict.

A decision to reduce a jury verdict because it is excessive as a matter of law rests entirely within the trial court's discretion. *Mulligan* v. *Rioux*, 229 Conn. 716, 753, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App. 546, 662 A.2d 15 (1995). Accordingly, we review the trial court's May 31, 2005 order for an abuse of that discretion. Id.

We reiterate briefly the relevant facts and procedural history. In the operative complaint, the plaintiff sought compensatory damages consisting of Scalzo's unpaid debt as of February, 2000, accrued interest on that debt, and costs of collection, namely, amounts that the plaintiff expended in pursuing Scalzo after learning the mortgage was invalid. The plaintiff claimed, and the evidence it presented showed, that the balance of Scalzo's debt as of February, 2000, when Scalzo promised the plaintiff a mortgage, was $43,935.44, and that interest was accruing on that balance at a monthly rate of 1.5 percent. Moreover, billing records in evidence showed collection costs of $24,616.09. The jury returned a verdict of $55,500 in total compensatory damages, but that verdict was not itemized as to the subcategories of damages sought. Nevertheless, the trial court reasoned that the plaintiff's receipt of $15,283.91 from the bankruptcy trustee, which necessarily consisted of a partial repayment of the principal and/or interest elements of Scalzo's debt, amounted to an improper duplicative recovery, and it reduced the verdict as a remedy.

The plaintiff claims that the trial court's order was improper because it rested on erroneous assumptions as to the breakdown of the verdict. It argues that, given the evidence presented, only $30,000 of the verdict represents the unpaid debt damages, and the remainder necessarily represents collection costs, although a

rough approximation thereof.[43] According to the plaintiff, the verdict had not compensated it for the remaining $13,935.44 of the debt, plus accruing interest, owed by Scalzo and, therefore, the $15,283.91 received from the bankruptcy trustee was not a duplicative recovery. The defendant counters that the trial court properly determined that the funds received from the trustee represented a double recovery, and that the verdict, if left undisturbed, would violate the basic legal prohibition against such recoveries. We conclude that the precise components of the jury verdict are not apparent or discernible and that, given that circumstance, the trial court's offset was unwarranted and improper.

The trial court's order was directed at preventing the plaintiff from receiving an excessive, duplicative recovery. "Connecticut courts consistently have upheld and endorsed the principle that a litigant may recover just damages for the same loss only once." (Internal quotation marks omitted.) *Mahon* v. *B. V. Unitron Mfg., Inc.*, 284 Conn. 645, 663, 935 A.2d 1004 (2007). "The rule precluding double recovery is a simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury. . . . Plaintiffs are not foreclosed from suing multiple

---

[43] In making this argument, the plaintiff focuses on Scalzo's share of the equity in the Padanaram Road property at the time of its transfer, which the evidence showed was $30,000, and it reasons that absent the defendant's fraud, the plaintiff could have recovered only this amount from Scalzo, and not the remaining principal or accruing interest. We note, however, that there was further evidence that Scalzo possessed other funds and assets between February, 2000, and August, 2000, from which the plaintiff, had it not believed it held a valid mortgage, might have pursued collection of its debt. See footnote 32 of this opinion. For this reason, we disagree with the plaintiff's argument that the verdict necessarily included only $30,000 of unpaid debt reimbursement. See *Virgo* v. *Lyons*, 209 Conn. 497, 509–10, 551 A.2d 1243 (1988) ("[t]his court cannot . . . look into the hearts and minds of the jurors and determine the injury for which they in fact compensated the plaintiff").

defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint [or successive][44] tortfeasors. . . . The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once. . . . Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments." (Internal quotation marks omitted.) *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 22 n.6, 699 A.2d 964 (1997); see also *Rowe* v. *Goulet*, 89 Conn. App. 836, 849, 875 A.2d 564 (2005) ("[d]uplicated recoveries . . . must not be awarded for the same underlying loss under different legal theories"); see, e.g., *Gionfriddo* v. *Gartenhaus Cafe*, 211 Conn. 67, 75–76, 557 A.2d 540 (1989) (where plaintiff brought action against second defendant for damages "identical to those claimed, awarded and recovered" in earlier action against different defendant, trial court improperly denied second defendant's motion for summary judgment).

Nevertheless, separate but related actions against multiple tortfeasors, even when both actions are successful, will not necessarily result in duplicate recoveries, particularly if the respective recoveries are intended to redress distinct losses. See *Gionfriddo* v. *Gartenhaus Cafe*, supra, 211 Conn. 74 (noting that satisfaction of judgment against one tortfeasor does not preclude recovery against second tortfeasor when respective judgments are for different injuries).[45] For example, in

---

[44] See *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 334 n.22, 593 A.2d 478 (1991).

[45] The authors of the Restatement (Second) of Torts have articulated this distinction. Section 885 (3) of the Restatement (Second) of Torts provides in relevant part that "[a] payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made . . . ." 4 Restatement (Second), Torts § 885 (3), p. 333 (1979). The accompanying commentary elaborates upon, and qualifies, the general principle: "Payments made by one of the tortfeasors on account of the tort either

*Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 317–19, 593 A.2d 478 (1991), the plaintiffs, a married couple who wrongfully had lost their house through foreclosure, pursued separate claims against their attorney in the foreclosure action and the defendants, the lenders who ultimately had taken title to the plaintiffs' house. In the action against their attorney, the plaintiffs alleged, and sought damages for, negligence, breach of contract and fraud. Id., 319. Additionally, on behalf of their children, they sought damages for emotional distress. Id. Prior to trial, that action was settled for $125,000. Id. Following the settlement with their attorney, the plaintiffs brought an action against the defendants for fraud and unjust enrichment, alleging the same damages as they had in the case against their attorney, with the exception of the damages for the children's emotional distress. Id., 316, 319. Following a jury trial, the plaintiffs were awarded economic damages of $45,000 and punitive damages of $16,000, and the plaintiff wife was awarded $5000 for emotional distress. Id., 316. The defendants filed a motion for remittitur, contending that the plaintiffs had obtained a double recovery, which the trial court denied. Id., 332–33.

On appeal, we affirmed the trial court's judgment. After acknowledging the general rule against duplicative recoveries, we concluded that the defendant had failed to show that the plaintiffs necessarily had received one. Specifically, there was "no evidence in the record concerning the allocation of the settlement [in the action against the plaintiffs' attorney] among the plaintiffs' claims for economic, emotional and punitive damages"; id., 334; particularly, as to what portion was

before or after judgment, diminish the claim of an injured person against all others responsible for the same harm." Id., § 885, comment (e), p. 335. "If the payment is made as full satisfaction for a specified item of damage, [however] the claim against the others is terminated *with respect to that item.*" (Emphasis added.) Id.

intended to redress the claim brought on behalf of their children. See id., 334–35 n.23. Consequently, we had "no means for determining that allocation, knowledge of which [was] necessary to determine whether the verdicts were in fact excessive." Id., 335.

This case involves a dynamic similar to that presented in *Kilduff*, although it is the second recovery, not the first, whose components are uncertain. Although the plaintiff claimed and presented evidence as to three separate elements of compensatory damages—the unpaid debt, accruing interest on that debt and costs of collection—the jury returned an undifferentiated lump sum verdict as to those damages. Accordingly, it is unclear *which* claimed damages the jury intended to redress, and to what degree. The plaintiff's subsequent recovery from the bankruptcy trustee, however, could apply to offset only the portion of the compensatory damages award that represented the unpaid debt and/ or interest owed by Scalzo, because the recovery was, essentially, a belated and involuntary, partial repayment of that debt.[46]

Because it was the defendant, an adjudicated tortfeasor, who sought a reduction of the jury's verdict posttrial, it was the defendant's burden to show that the jury's award included full compensation for the loss of Scalzo's debt and accruing interest, such that the bankruptcy recovery necessarily was duplicative. See, e.g., *Jones* v. *Kramer*, 267 Conn. 336, 349–50, 838 A.2d 170 (2004) (defendant seeking reduction of verdict bears burden of showing it is duplicative); cf. *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 669–70, 686 A.2d 491 (1997) (defendant bears burden of proving

---

[46] The claim filed by the plaintiff with the bankruptcy court, for which it received partial compensation, totaled $52,530, representing the principal balance of Scalzo's debt as of February, 2000, and interest accrued through January, 2001. The plaintiff made no claim with that court for the costs of collection it expended in pursuing Scalzo.

plaintiff's mitigation efforts resulted in double recovery). In light of the damages claimed and the evidence presented, however, it is entirely possible that the jury intended the damages award to include only partial reimbursement for that debt, and, for example, full or partial reimbursement for accruing interest and/or collection costs. Accordingly, the defendant's request for a remittitur rested on an uncertain factual premise. Because the defendant failed to meet his burden, we conclude that the trial court improperly reduced the verdict by the amount of the plaintiff's bankruptcy recovery.[47] As a consequence, the court's removal of the offer of judgment interest originally awarded also was improper.

B

The plaintiff's second claim is that the trial court improperly opened the judgment and reduced the damages award, sua sponte, without notice to the parties and an opportunity for the plaintiff to argue that the reduction was unwarranted. In light of our determina-

[47] The defendant's reliance on the general verdict rule to counter the plaintiff's argument as to this claim is misplaced. Under that rule, "if a jury renders a general verdict for one party, and no party requests interrogatories, [it is presumed] that the jury found every issue in favor of the prevailing party. . . . Thus, in a case in which the general verdict rule operates, if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fall. . . . The rule rests on the policy of the conservation of judicial resources, at both the appellate and trial levels." (Internal quotation marks omitted.) *Dowling* v. *Finley Associates, Inc.*, 248 Conn. 364, 371, 727 A.2d 1245 (1999). To the extent the general verdict rule even applies in this context; see id., 372; it cannot aid the defendant. Because it was *the defendant*, in the first instance, who sought to upset the jury's verdict, it was *the defendant's burden* to establish that every possible composition of that verdict, as supplemented by the bankruptcy recovery, would result in an improperly inflated award. On appeal, the plaintiff seeks only to reinstate that verdict, not to disturb it on the basis of unproven assumptions as to its composition. Because a proper composition of the verdict is conceivable, the plaintiff is entitled to the relief sought.

tion that the trial court's reduction of the damages award was improper, this claim is moot.

The judgment is reversed and the case is remanded to the trial court with direction to reinstate the jury's award of damages as supplemented by the court's awards of exemplary damages, prejudgment interest and offer of judgment interest.

In this opinion the other justices concurred.